# EXHIBIT  G

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life    )
Term Parole Consideration    )                CDC Number H-74168
Hearing of:                  )
                             )
JUAN CHAVEZ                  )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MARCH 5, 2007

2:32 P.M.

PANEL PRESENT:

Stan Kubochi, Presiding Commissioner
Robert Harmon, Deputy Commissioner

OTHERS PRESENT:

Juan Chavez, Inmate
Richard Rutledge, Attorney for Inmate
Don Eastman, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No          See Review of Hearing
_____    Yes         Transcript Memorandum

**TAMYRA MORGAN**
**NORTHERN CALIFORNIA COURT REPORTERS**

ii

## INDEX

Page

Proceedings.............................................1

Case Factors...........................................11

Pre-Commitment Factors.................................13

Post-Commitment Factors................................18

Parole Plans...........................................16

Closing Statements.....................................47

Recess.................................................54

Decision...............................................55

Adjournment............................................61

Transcriber Certification..............................62

--oOo--

1

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **DEPUTY COMMISSIONER HARMON:**  And you're on |
| 3 | record. |
| 4 | **PRESIDING COMMISSIONER KUBOCHI:**  Hello.  This is |
| 5 | a Subsequent Parole Consideration Hearing for Juan |
| 6 | Chavez, CDC number H-74168.  Today's date is March 5th. |
| 7 | It's approximately 2:32 p.m.  We are at the California |
| 8 | Correctional Training Facility at -- near Soledad, |
| 9 | California.  Excuse me.  I forgot to hand this to you. |
| 10 | Could you please review the document checklist as well |
| 11 | as kind of slide it right there, 1073 Form near your |
| 12 | client.  Mr. Chavez, I want to clarify a couple |
| 13 | preliminary matters in that we have a summary of your |
| 14 | progress for 2006.  And my personal practice is to |
| 15 | allow you to provide any approval updates specifically |
| 16 | as to work assignment, academic progress, self-help, |
| 17 | self-study, group therapies in order for you to feel |
| 18 | comfortable that you've provided this Panel with all |
| 19 | updated information, okay? |
| 20 | **INMATE CHAVEZ:**  Yes, Sir. |
| 21 | **PRESIDING COMMISSIONER KUBOCHI:**  I have received |
| 22 | a letter from your brother, Herman Hoyos, H-O-Y-O-S -- |
| 23 | **INMATE CHAVEZ:**  Yes, Sir. |
| 24 | **PRESIDING COMMISSIONER KUBOCHI:**  -- that this |
| 25 | Panel will consider.  In regard to any other letters of |
| 26 | support, clearly you have a right to present documents |
| 27 | on your behalf.  I would direct you work with your |

1    attorney.  If there are any letters of support that

2    this Panel does not received, I will allow you to make

3    a verbal offer of proof as to whom would have been the

4    author of those letters.  And based on the last

5    conversation with that person, what the letters would

6    have stated and advised us of.  And that way you will

7    be assured that this Panel has all the current

8    information necessary to review your suitability.  Is

9    that agreeable, sir?

10        **INMATE CHAVEZ:**  Yes, Sir.

11        **PRESIDING COMMISSIONER KUBOCHI:**  Because it's my

12   understanding that your hearing was set for this week,

13   and it is your desire to proceed with this hearing with

14   the knowledge that this Panel does not have a 2007

15   Board report from your correctional -- your current

16   correctional counselor.

17        **INMATE CHAVEZ:**  Yes, Sir.

18        **PRESIDING COMMISSIONER KUBOCHI:**  But I have

19   noted prior decisions that didn't influence me one way

20   or the other, but in regard to what they recommended

21   and what their findings were as well as other Board

22   reports.  And like I said, I'm comfortable proceeding

23   with your updates in regard to any of the information

24   that Commissioner Harmon covers because he does

25   post-conviction factors.  In other words, let's say

26   hypothetically if you're current job or work assignment

27   is different than the 2006 chrono, feel free to tell us

3

1    what that is.

2        **INMATE CHAVEZ:**  Yes, Sir.

3        **PRESIDING COMMISSIONER KUBOCHI:**  Your

4    schedule -- Your hearing was scheduled for Friday at

5    8:30; however, because of a postponement of another

6    case, we are filling the time slot at this point in

7    time and that's agreeable with you.

8        **INMATE CHAVEZ:**  Yes, Sir.

9        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Our

10   information and I am going to state some basic

11   information.  It is background information.  If you

12   feel that there's a need to correct any of the

13   information that either I state for the record or that

14   Commissioner Harmon states for the record, you will be

15   given an opportunity to do so.  Clearly, you will also

16   have an opportunity to confer with your attorney,

17   Mr. Rutledge.  All I ask of you is that you wait for a

18   pause in the current speakers discussion because these

19   proceeding will be transcribed and the court reporter

20   can't -- cannot comprehend two voices speaking at once

21   and make an accurate record of this case.  Okay, so

22   just kind of wait for a pause such as your life began

23   on or about April 23rd or April 24th, 1993.  If that's a

24   misstatement, you'll be given a chance to correct us

25   with that.  But that information is simply background

26   in these proceedings.  Your Minimum Eligible Parole

27   Date was November 30th, 2002.  And it appears that your

4

1    controlling offense was for violation of count one,

2    Penal Code Section 187, that's murder in the second

3    degree, and that the docket number was NA13974, for

4    which you received a term of 15 years to life.  So,

5    because this proceeding will be transcribed, for the

6    purposes of voice identification for the transcriber,

7    we're going to go around to my left and identify

8    ourselves.  We're going to state our first name, spell

9    our last name.  And when it comes to your turn, please

10   spell your last name, but add your CDC number.  My name

11   is Stan Kubochi, K-U-B-O-C-H-I, Commissioner.

12        **DEPUTY COMMISSIONER HARMON:**  Robert Harmon,

13   H-A-R-M-O-N, Deputy Commissioner.

14        **DEPUTY DISTRICT ATTORNEY EASTMAN:**  Don Eastman,

15   Deputy District Attorney, Los Angeles County.

16        **ATTORNEY RUTLEDGE:**  Richard Rutledge,

17   R-U-T-L-E-D-G-E, Counsel for Mr. Chavez.

18        **INMATE CHAVEZ:**  Inmate Chavez, Juan Chavez,

19   C-H-A-V-E-Z, CDC number H-74168.

20        **PRESIDING COMMISSIONER KUBOCHI:**  In addition,

21   there are two officers here for security purposes, and

22   they are non-participants.  Before we begin the actual

23   hearing, sir, I have to review your rights pursuant to

24   the Americans with Disabilities Act, which requires the

25   Board of Parole Hearings to accommodate any physical

26   disabilities that could prevent you from effectively

27   communicating with this Panel.  I note that last year,

1  a correctional counselor reviewed your Central File

2  with you, and that they -- Could you please advise me

3  because the form is on your side of the table whether

4  or not the correctional counselor noted any

5  disabilities that would preclude you from participating

6  in the hearing?

7      **INMATE CHAVEZ:**  No disabilities at all.

8      **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Did you

9  sign that form also?

10     **INMATE CHAVEZ:**  Yes, I did.

11     **PRESIDING COMMISSIONER KUBOCHI:**  And there's a

12  checked box in regard to whether or not you believe

13  that you need assistance to conduct this hearing?

14     **INMATE CHAVEZ:**  Yes, there is.

15     **PRESIDING COMMISSIONER KUBOCHI:**  And what

16  checked box did you want?

17     **INMATE CHAVEZ:**  I do not need any help with a

18  parole hearing.

19     **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

20  Mr. Chavez, do you need -- excuse me.  Do you have any

21  hearing impairments?

22     **INMATE CHAVEZ:**  No, I don't.

23     **PRESIDING COMMISSIONER KUBOCHI:**  Do you have any

24  vision problems?

25     **INMATE CHAVEZ:**  No, I do not.

26     **PRESIDING COMMISSIONER KUBOCHI:**  What was your

27  highest grade school that you accomplished either

6

1    outside or inside of prison?

2         **INMATE CHAVEZ:**  Tenth grade and my GED.

3         **PRESIDING COMMISSIONER KUBOCHI:**  And what year

4    did you get your GED, sir?

5         **INMATE CHAVEZ:**  In 1992.

6         **PRESIDING COMMISSIONER KUBOCHI:**  And you have no

7    problems reading documents without glasses?

8         **INMATE CHAVEZ:**  Not at all.

9         **PRESIDING COMMISSIONER KUBOCHI:**  And I saw -- I

10   noticed you walking to this hearing.  You have no

11   problems walking?

12        **INMATE CHAVEZ:**  None at all.

13        **PRESIDING COMMISSIONER KUBOCHI:**  And going

14   upstairs?

15        **INMATE CHAVEZ:**  No.

16        **PRESIDING COMMISSIONER KUBOCHI:**  Among your

17   rights, you have the right to review your Central File.

18   Were you physically able to do so?

19        **INMATE CHAVEZ:**  Yes, Sir.

20        **PRESIDING COMMISSIONER KUBOCHI:**  Thank you very

21   much.  In the last year, have you been prescribed any

22   medications that could affect your ability to think

23   clearly today?

24        **INMATE CHAVEZ:**  None whatsoever.

25        **PRESIDING COMMISSIONER KUBOCHI:**  Counsel, are

26   there any ADA issues that you wish this Panel would

27   address at this time?

1            **INMATE CHAVEZ:**  No, Commissioner.

2            **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.

3    Sir, this hearing is being conducted pursuant to the

4    Penal Code and the rules and regulations of the Board

5    of Parole Hearings governing Parole Considerations for

6    life inmates.  The purpose of today -- today's hearing

7    is to once again consider your suitability for parole.

8    In doing so, we will consider the facts of the

9    underlying crimes that resulted in the life commitment;

10   thank you; any prior record if any, personal history

11   facts, personal social history facts before your

12   incarceration, and also your parole plans.

13   Commissioner Harmon will review your post conviction

14   factors.  And as I've indicated, feel free to tell us

15   the most current information.  This is your hearing and

16   it is very important for us to make a decision that is

17   based on information that you believe is not only

18   accurate but also current especially when it comes to a

19   change in parole plans because I've looked through the

20   records, and it's a changed a little bit.  But that's

21   to be expected because life out on the street changes,

22   so we don't hold that against you.  We just want to

23   know what your current plans are when that topic

24   arises, Mr. Chavez.

25           **INMATE CHAVEZ:**  Yes, Sir.

26           **PRESIDING COMMISSIONER KUBOCHI:**  We will reach a

27   decision today and inform you of whether or not we find

1  you suitable for parole and the reasons for our

2  decision.  If you are found suitable for parole, the

3  length of your confinement will be explained to you.

4  Before we recess for deliberations, the District

5  Attorney's representative, Mr. Eastman, your attorney,

6  and you will be given the opportunity to make a final

7  statement regarding your parole suitability.  Your

8  statement shall be limited as to why you feel you are

9  suitable for release.  We will then recess, clear the

10  room, and deliberate.  Once we have completed our

11  deliberations, we will resume and announce our

12  decision.  The California Code of Regulations states

13  that regardless of time served, a life inmate shall be

14  found unsuitable for and denied parole if in the

15  judgment of the Panel the inmate would pose an

16  unreasonable risk of danger to society if released from

17  prison.  Sir, I've already indicated you have a right

18  to review your Central File before this hearing, and

19  you've indicated that you have had that opportunity.

20  In addition, you have the right to a timely notice of

21  this hearing.  Did you receive timely notice?

22       **INMATE CHAVEZ:**  Yes, I did.

23       **PRESIDING COMMISSIONER KUBOCHI:**  And in addition

24  as I've indicated at the outset of this hearing, you

25  have the right to present all relevant documents that

26  you believe will support your suitability.  And I've

27  indicated to you in the event that some people that you

9

1    have previously talked to you about sending in letters

2    of support or personal reference, and you didn't

3    receive it, I'm going to give you an opportunity to

4    identify who that person was based on your

5    conversations and tell us what that letter would have

6    stated in your behalf.  In addition, sir, you have a

7    right to be heard by an impartial Panel.  Do you

8    understand that right?

9        **INMATE CHAVEZ:**  By an impartial Panel?

10        **PRESIDING COMMISSIONER KUBOCHI:**  Impartial

11    Panel.  It is a Panel of Commissioners who has no

12    biases against you.  You have that right.  Do you

13    understand that right?

14        **INMATE CHAVEZ:**  Yes, Sir.

15        **PRESIDING COMMISSIONER KUBOCHI:**  Are you

16    prepared to proceed with Commissioner Harmon and myself

17    today?

18        **INMATE CHAVEZ:**  Yes, Sir.

19        **PRESIDING COMMISSIONER KUBOCHI:**  Sir, we have

20    advised you that we will reach a decision today.  You

21    will receive a copy of our written decision today.

22    That decision is tentative and does not become final

23    within 120 days.  A copy of the decision and a copy of

24    the transcript will be delivered to you.  In regard to

25    any appeal rights, I would advise you to discuss with

26    your attorney as to what rights (inaudible) experienced

27    in this regard of any appeal rights.  The Board has

10

1  eliminated its appeal process.  Sir, you are not

2  required to admit or discuss your offense.  However,

3  this Panel does accept as true the findings of the Los

4  Angeles County Superior Court.  Do you understand that?

5       **INMATE CHAVEZ:**  Yes, Sir.

6       **PRESIDING COMMISSIONER KUBOCHI:**  We're not here

7  to relitigate your case.  Do you understand that?

8       **INMATE CHAVEZ:**  Yes, Sir.

9       **PRESIDING COMMISSIONER KUBOCHI:**  The District

10  Attorney is permitted to ask questions, but he asks the

11  questions to this Panel and you'll answer up to this

12  Panel.  This is not adversarial.  He's not allowed to

13  ask you questions directly.  Commissioner Harmon, is

14  there any confidential material that will be used in

15  our deliberations today?

16       **DEPUTY COMMISSIONER HARMON:**  Now there is

17  confidential information in his file, and no, it won't

18  be utilized in today's hearing.

19       **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Chavez,

20  I'll give a hearing checklist to you -- your attorney.

21  He's handed it over to the DA.  And the purpose of that

22  is to assure you that everybody in this room is

23  operating on the same set of facts.  Everybody here is

24  prepared to accept your current statements as to what

25  your progress was in the last year.  Do you understand

26  that?

27       **INMATE CHAVEZ:**  Yes, Sir.

11

1      **PRESIDING COMMISSIONER KUBOCHI:**  That checklist

2    would be marked Exhibit One.  Sir, do you intend to

3    talk about the life crime with us?

4      **INMATE CHAVEZ:**  Yes, I do.

5      **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Would

6    you raise your right hand, please?  Do you solemnly

7    swear or affirm that this testimony that you give at

8    this hearing will be the truth, the whole truth, and

9    nothing but the truth?

10      **INMATE CHAVEZ:**  Yes, I do.

11      **PRESIDING COMMISSIONER KUBOCHI:**  I will now read

12    a Statement of Facts into the record, and those facts

13    for your Counsel will be taken from the probation

14    report file with the Los Angeles County Superior Court.

15    It states that in count one Mr. Chavez was accused of

16    the crime of murder; the murder of Sonia, S-O-N-I-A,

17    Sanchez, S-A-N-C-H-E-Z, as follows:

18          "Inmate and Ms. Sanchez were involved in a

19          relationship.  The victim and Ms. Sanchez

20          were present at a party.  The defendant --

21          The inmate and Ms. Sanchez had agreed to

22          meet at that party at some point in time

23          at some specific location.  Items of

24          clothing were removed.  There appeared to

25          have been sexual intercourse.  An argument

26          ensued and the victim choked to death."

27    According to court documents the other Board reports,

12

1   your client indicated that he had blacked out.  When he

2   awoke, the victim was dead.  The coroner's report

3   verified that the victim died of strangulation.  That

4   is a very essential Statement of Facts.  That's a

5   starting point, Mr. Chavez.

6          **ATTORNEY RUTLEDGE:**  Commissioner, could I

7   interject?  When you read that Statement of Facts, you

8   indicated that they actually had completed having

9   sexual intercourse, and the record that I have shows

10  that they were preparing to have sexual intercourse.

11         **PRESIDING COMMISSIONER KUBOCHI:**  That's correct.

12         **ATTORNEY RUTLEDGE:**  Okay, thank you.

13         **PRESIDING COMMISSIONER KUBOCHI:**  It is done in

14  such a conclusionary manner that I was paraphrasing in

15  that I have also read Board reports, et cetera.  The

16  specific statement was as the defendant and victim had

17  removed some clothing, and was preparing to have sexual

18  intercourse, an argument ensued, and the defendant

19  choked the victim.  The defendant blacked out.  And

20  when defendant awoke, the victim was dead.  That is the

21  exact statement.  There are more details in the Board

22  report, as they are permitted to glean all the

23  documents through the defendant's -- in the inmate's

24  prior background to come up with the Board reports and

25  not just, however, for accuracy purposes.  I chose to

26  just have that short statement read into the record.

27  It appears based on the probation report, that the

13

1    inmate advised probation verbally (inaudible), in the

2    narrative that he was arrested for shoplifting at the

3    age 13.  That he went to a camp called Mira Loma for

4    six weeks.  At age 15, he was sent away to a camp for

5    PCP use.  As an adult in November 1981, he was arrested

6    for a burglary, violation of Section Penal Code 459.

7    That case was resolved as a 459 misdemeanor.  That is

8    burglary and 459 of the Penal Code.  He was placed on

9    probation for 36 months and was given a period in jail.

10   In regard to personal history, and I'm reading from the

11   older Board report, Counsel, specifically April of

12   2002.  It says that Mr. Chavez was born to Jose and

13   Gloria Rodriquez, spelled R-O-D-R-I-Q-U-E-Z, on July

14   3rd, 1968.  His father was a welder and his mother sold

15   Avon cosmetics.  He has four brothers and sisters, and

16   at the time of the commitment, had fathered four

17   children.  He had never legally been married.  That he

18   had a common law relationship.  Sir, you can correct

19   me.  I'm just reading and I have to paraphrase because

20   the grammar used indicates that you had had a

21   relationship with Evelyn Carpio (phonetic)?

22        INMATE CHAVEZ:  No.  Yes, Sir.  The part about

23   my father --

24        PRESIDING COMMISSIONER KUBOCHI:  Yes?

25        INMATE CHAVEZ:  -- that's my stepfather.

26        PRESIDING COMMISSIONER KUBOCHI:  Okay.

27        INMATE CHAVEZ:  That was my stepfather and not

14

1   my birth father.

2           **PRESIDING COMMISSIONER KUBOCHI:**  That father was

3   a welder.

4           **INMATE CHAVEZ:**  Yes, Sir.

5           **PRESIDING COMMISSIONER KUBOCHI:**  And your

6   relationship was with Evelyn Carpio?

7           **INMATE CHAVEZ:**  Yes, Sir.

8           **PRESIDING COMMISSIONER KUBOCHI:**  Between '86 and

9   '92?

10          **INMATE CHAVEZ:**  Yes, Sir.

11          **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Thank

12  you for making that correction.  I don't want to

13  have -- I'm only reading the Board report as background

14  and I want you to feel that you have a fair hearing and

15  that it's based on accurate information.

16          **INMATE CHAVEZ:**  Yes, Sir.

17          **PRESIDING COMMISSIONER KUBOCHI:**  That

18  relationship was between 1986 and 1992.  The Board

19  report mentions an Emelda Montes, M-O-N-T-E-S.

20          **INMATE CHAVEZ:**  Yes, Sir.

21          **PRESIDING COMMISSIONER KUBOCHI:**  Was that a

22  separate relationship?

23          **INMATE CHAVEZ:**  Yes, it was.

24          **PRESIDING COMMISSIONER KUBOCHI:**  And that was

25  approximately from 1990 to 1993.

26          **INMATE CHAVEZ:**  Yes, Sir.

27          **PRESIDING COMMISSIONER KUBOCHI:**  That

15

1   relationship lasted through your commitment to state

2   prison?

3       **INMATE CHAVEZ:**  Yes, it did.  We are still

4   friends as of today.

5       **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  And

6   that's the purpose of having this dialogue.  I'm trying

7   to blend the past into the present as best as possible.

8   You had told your correctional counselor back in

9   (inaudible) 2002, that you did not have any abuse

10  within the family, and that you had some discussion

11  with both the probation department and correctional

12  counselors in the institution that before your

13  incarceration you had used illegal drugs.

14      **INMATE CHAVEZ:**  Yes, Sir.

15      **PRESIDING COMMISSIONER KUBOCHI:**  Okay, and two

16  in particular were (inaudible) cocaine and marijuana.

17      **INMATE CHAVEZ:**  Yes, Sir.

18      **PRESIDING COMMISSIONER KUBOCHI:**  There's also a

19  mention there was past use of PCP.

20      **INMATE CHAVEZ:**  Yes, Sir.

21      **PRESIDING COMMISSIONER KUBOCHI:**  Sir, since your

22  incarceration, has your children -- any of your

23  children had contact with you either by phone, letter,

24  or personal visit?

25      **INMATE CHAVEZ:**  Yes, Sir.  I have my son that I

26  have with Emelda Montes visits roughly about three

27  times a year.  My other three children they write to me

1  from time to time and I called at least once a year

2  over the phone.

3      **PRESIDING COMMISSIONER KUBOCHI:**  Sir, in regard

4  to your parole plans, and I realize that we're trying

5  to go over past plans and I then I want you to work

6  forward.  Like I said, I'm holding any changes against

7  you.  I simply want -- I just simply need a starting

8  point to make that type of evaluation.  Okay, back in

9  '90 -- Back in 2002, you had hoped to live with your

10  fiancée --

11      **INMATE CHAVEZ:**  Yes, Sir.

12      **PRESIDING COMMISSIONER KUBOCHI:**  -- if paroled.

13      **INMATE CHAVEZ:**  She got sick and couldn't handle

14  the pressure from being at Board and (inaudible) and

15  whatnot.  So we decided just to be friends.  And I made

16  new parole plans to move in with my younger brother and

17  his family in Southern California.

18      **PRESIDING COMMISSIONER KUBOCHI:**  Yes, I did note

19  that.  The most recent information was that you would

20  like to live with your brother, Mr. Frank Hennings

21  (phonetic.

22      **INMATE CHAVEZ:**  Yes, Sir, correct.

23      **PRESIDING COMMISSIONER KUBOCHI:**  He lives in

24  Azusa, California.

25      **INMATE CHAVEZ:**  Yes, Sir.

26      **PRESIDING COMMISSIONER KUBOCHI:**  And the letter

27  received in 2007 from Herman Hoyos indicates that he

17

1   can offer you full support and that he has a job

2   waiting for you with a roofing company with whom he is

3   employed.

4          **INMATE CHAVEZ:**  Yes, Sir.

5          **PRESIDING COMMISSIONER KUBOCHI:**  Is that

6   correct, sir?

7          **INMATE CHAVEZ:**  Yes, Sir.  That is my older

8   brother.  My last meeting they told me to have plan B

9   parole plans, so I do so.

10         **PRESIDING COMMISSIONER KUBOCHI:**  And what is

11  another plan because I didn't ask you about -- I know

12  Mr. Hennings, but was there any employment related to

13  Azusa, California.

14         **INMATE CHAVEZ:**  With my younger brother,

15  Mr. Hennings, I was going to go work with him at the

16  company he works for.

17         **PRESIDING COMMISSIONER KUBOCHI:**  Which would be?

18         **INMATE CHAVEZ:**  It's a like a little (inaudible)

19  type bakery and factory where they do -- he does

20  mechanic work and electric -- electrical work for the

21  company.  And I was going to be hired as a maintenance

22  worker.

23         **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Thank

24  you very much.  At this time, Commissioner Harmon will

25  discuss post-conviction factors with you.

26         **DEPUTY COMMISSIONER HARMON:**  Yes.  Good

27  afternoon.

18

1        **INMATE CHAVEZ:**  Good afternoon.

2        **DEPUTY COMMISSIONER HARMON:**  Let's just make

3   sure the record is correct.  Listen carefully.  I'll

4   draw out some information here.  It does show that your

5   last hearing was April 12th of '06.  At that time, you

6   received a one-year denial.  That was subsequent

7   hearing number one.  You were received at CTF July 2nd,

8   1998, from Lancaster.  Custody level today is Medium A.

9   Your revised Class Score is 19.  Does that all sound

10  right to you?

11       **INMATE CHAVEZ:**  Yes, Sir.

12       **DEPUTY COMMISSIONER HARMON:**  Okay.  I don't have

13  your counselor's report to bring me up to date other

14  than the C-File, so maybe what you could tell me is

15  over the last year specifically what activities have

16  you been doing and been involved with?

17       **INMATE CHAVEZ:**  I've been active in AA and NA.

18  I have some updated chronos in there, which should be

19  in my C-File as well.

20       **DEPUTY COMMISSIONER HARMON:**  Yes, I think I have

21  those.  I've got one as recently as January of '07.

22       **INMATE CHAVEZ:**  Yes, Sir.  I also completed an

23  Anger Management Class and self-help classes in PIA

24  Wood Products Company that I work for, which I have a

25  copy of right here.

26       **DEPUTY COMMISSIONER HARMON:**  Okay.

27       **PRESIDING COMMISSIONER KUBOCHI:**  What date was

19

1  that, sir?

2      **INMATE CHAVEZ:**  This is January 19th, 2007.

3      **DEPUTY COMMISSIONER HARMON:**  Thank you.  Go

4  ahead and keep talking.  I've got -- I've got this,

5  okay.

6      **INMATE CHAVEZ:**  I have a letter that comes from

7  PIA because they provide us a lot of information for

8  parole plans and for self-help programs and companies

9  that are all involved with PIA Wood Products for when

10  if you parole.  Charley Walker, which is the

11  superintendent -- Superintendent I, they have a Lifer

12  Program out there where we take a class for Anger

13  Management every three months.  We take an evaluation

14  at work for our job skills.  And upon parole, they

15  provide us with all information including companies

16  that will hire us if we are certified with them, which

17  I have a certification of completion in here.

18      **DEPUTY COMMISSIONER HARMON:**  Stay within the

19  last year.  Are you going into welding right now?

20      **INMATE CHAVEZ:**  No.  No.  No.  This is all from

21  Wood Products.  These are all from the Wood Products in

22  PIA where I work at.  I've been working there since

23  2003.

24      **DEPUTY COMMISSIONER HARMON:**  Okay.

25      **INMATE CHAVEZ:**  That's the -- all the latest

26  information I have is from PIA Wood Products,

27  certificates, and chronos.  Anger management is

1  provided -- is provided from the PIA.  Since I moved

2  over to the east dorm in 2003, I've been working in

3  Wood Products as a Finishing Sander building and hand

4  finishing furniture.  I have all my -- all my

5  certificates in there from Welding, which was one of

6  the skills that I was providing for myself to have a

7  job option upon release.

8      **DEPUTY COMMISSIONER HARMON:**  Okay.

9      **INMATE CHAVEZ:**  But most likely when I get out

10  on release, I'll be working in roofing with my older

11  brother, Herman Hoyos.

12      **DEPUTY COMMISSIONER HARMON:**  Okay.  These

13  certificates you gave me from PIA shows 1,500-plus

14  hours in the (inaudible).

15      **INMATE CHAVEZ:**  Once we reach x amount of hours,

16  we are in the computer as part of the PIA Work

17  Industry.  And they help us with work and needs through

18  them upon release.

19      **DEPUTY COMMISSIONER HARMON:**  Okay.  Go ahead.

20      **INMATE CHAVEZ:**  Outside of that, I've just been

21  staying out of trouble, attending my self-help AA,

22  which I find is very important for myself, and working.

23      **DEPUTY COMMISSIONER HARMON:**  Okay.  Yeah, that

24  helps us a lot because I've got the C-File to go off of

25  and I want to make sure that everything corroborates

26  with what I've got right now.  I'll return these to you

27  in just a little bit.  You discussed with us here that

1   you have some Welding skills in 2000.  You completed

2   the vocational Welding Technology Program.

3         **INMATE CHAVEZ:**  Yes, Sir.

4         **DEPUTY COMMISSIONER HARMON:**  And you carried

5   your skills into that particular area as a Finisher.

6         **INMATE CHAVEZ:**  Yes, Sir.

7         **DEPUTY COMMISSIONER HARMON:**  You've done some

8   work in -- Other work includes you've done some Yard

9   Crew work, Porter work, Cook work, Porter work, and you

10  continue to get good work reports for those jobs.  When

11  you include -- You got your GED in '99.

12        **INMATE CHAVEZ:**  '92.

13        **DEPUTY COMMISSIONER HARMON:**  Okay, I'm going of

14  the chrono.

15        **INMATE CHAVEZ:**  Okay.

16        **DEPUTY COMMISSIONER HARMON:**  Okay, it's the

17  counselor's chrono.  That's okay.  You've got your GED.

18  I found a TABE Score of 12.9 -- 12.9 and a reading

19  level of 12.9.  Self-help and group programs -- Let's

20  see here.  You discussed it briefly.  The Anger

21  Management in '05 was a video program, a three-hour

22  program.

23        **INMATE CHAVEZ:**  Yes, Sir.

24        **DEPUTY COMMISSIONER HARMON:**  And then the Inmate

25  Employability Program was also in '05.  That was a

26  video.

27        **INMATE CHAVEZ:**  Yes, Sir.

22

1      **DEPUTY COMMISSIONER HARMON:**  And let's see.  It

2    looks like in the late '90s you were involved with

3    Bible Studies and Ministries.

4      **INMATE CHAVEZ:**  Yes, Sir.

5      **DEPUTY COMMISSIONER HARMON:**  (Inaudible)

6    ministries and that.  And back in '97, you were a

7    founding member of Lifers' Support Group, I believe, at

8    Pleasant Valley.

9      **INMATE CHAVEZ:**  Yes, Sir.

10     **DEPUTY COMMISSIONER HARMON:**  And you were in

11   that, and the Parenting Curriculum in 2000, the Impact

12   Workshop in '98.  You started Criminon and you took

13   first segment.  I think there are about 18 to 20

14   segments but you took The Way to Happiness in '97.

15     **INMATE CHAVEZ:**  Yes, Sir.

16     **DEPUTY COMMISSIONER HARMON:**  How come you never

17   went on and finished the whole series?

18     **INMATE CHAVEZ:**  Well, I transferred from

19   Pleasant Valley to Soledad.  And when I transferred

20   when I was trying to get a hold of a lot of these other

21   programs, they were just unavailable anymore.

22     **DEPUTY COMMISSIONER HARMON:**  But that's

23   correspondence, isn't it?

24     **INMATE CHAVEZ:**  Yes, Sir.  Through mail like

25   I'll write them, and I would not get anything in

26   return, so I just moved on with what I could find

27   around here.

23

1      **DEPUTY COMMISSIONER HARMON:**  What self-help did
2   you participate in with Dr. Gleason?  What was that?
3      **INMATE CHAVEZ:**  It was Anger and Self-Awareness.
4      **DEPUTY COMMISSIONER HARMON:**  And what year was
5   that?
6      **INMATE CHAVEZ:**  That was 2005.
7      **DEPUTY COMMISSIONER HARMON:**  Did you keep a copy
8   of that?  Did you do a book report?
9      **INMATE CHAVEZ:**  Yes, I did.
10     **DEPUTY COMMISSIONER HARMON:**  Do you want to
11  leave that with us during the intermission?
12     **INMATE CHAVEZ:**  I don't -- She kept it.  She
13  never returned the book report.  All she did was give
14  me a chrono stating --
15     **DEPUTY COMMISSIONER HARMON:**  Yeah, I've got the
16  chrono.  That's why I wanted to -- I wanted to look at
17  the --
18     **INMATE CHAVEZ:**  Yeah.  She kept the book report.
19  She never returned the book report.
20     **DEPUTY COMMISSIONER HARMON:**  Okay.  And AA, you
21  been in that now for how long?
22     **INMATE CHAVEZ:**  Since 1993.
23     **DEPUTY COMMISSIONER HARMON:**  Okay.  Are you
24  currently a Chair?
25     **INMATE CHAVEZ:**  Excuse me?
26     **DEPUTY COMMISSIONER HARMON:**  Are you currently
27  the Chair -- Chairman?

24

1      **INMATE CHAVEZ:**  No.  No, I get real nervous

2   speaking in front of big crowds.  I just participate as

3   best as possible.

4      **DEPUTY COMMISSIONER HARMON:**  Okay.  Do you know

5   all Twelve Steps?

6      **INMATE CHAVEZ:**  I know about seven of them.  I

7   never really memorized all twelve.  Mainly, the main

8   ones that I remember is to amend.

9      **DEPUTY COMMISSIONER HARMON:**  Okay.  Why haven't

10  you ever -- Why haven't you ever memorized all twelve

11  being in there since '93?  You're got a 12.9 reading

12  level, which includes comprehension?

13     **INMATE CHAVEZ:**  Well, to be honest, I don't

14  know.  I could sit here and try to make something up

15  but I'm not.  I've never really --

16     **DEPUTY COMMISSIONER HARMON:**  I hope it's real

17  important to you.

18     **INMATE CHAVEZ:**  Well, it is.  As matter of fact,

19  if I may, I wear this acorn around my neck as a

20  reminder that I read the serenity prayer every morning

21  when I get up and when I go to bed.  And I participate

22  because it's important to me because I realize that it

23  was because of my drinking that my life went the way

24  that it went.  And I've done everything that I can to

25  correct that.  Now I haven't sat there and memorized

26  all the Steps and everything, but I participate as best

27  I can.  I was even Chairman when I was in Pleasant

25

1    Valley and there should be a chrono in there about

2    that.  I did everything that I could with AA groups

3    including fundraisers and whatnot.  But I just never --

4    When I worked through the Steps and was studying them,

5    I never really sat there to try to memorize them.  I

6    watch a lot of guys that prepare for Board.  And they

7    sit there, and they're cramming and trying to remember

8    them.  I try to (inaudible).  If it's true inside of

9    you, that's what really should matter.

10        **DEPUTY COMMISSIONER HARMON:**  Okay.  You also did

11   a 12-hour workshop, Laubach Workshop.

12        **INMATE CHAVEZ:**  Yes, Sir.

13        **DEPUTY COMMISSIONER HARMON:**  Did you ever get

14   involved in -- I was looking for chronos that might

15   have dealt with training individuals.  Was it in

16   education?

17        **INMATE CHAVEZ:**  Yes, it was in education.  And

18   what I did is I would help inmates who couldn't speak

19   or understand English.  I would help them translate,

20   and try to learn how to read English.  I was a part of

21   that only for a short period of time.  Shortly after

22   that, I was transferred out of Pleasant Valley where

23   the program was at.

24        **DEPUTY COMMISSIONER HARMON:**  Okay.  You've never

25   had a 115.

26        **INMATE CHAVEZ:**  No, Sir.

27        **DEPUTY COMMISSIONER HARMON:**  That's commendable.

26

1    You've only ever had four 128s, the last one was August

2    16th of 2000 for failing to respond, so it's obviously

3    very important that you've never been in trouble for

4    weapons or any type of violence.  That's extremely

5    important.  Does that pretty well cover your

6    accomplishments?  I think we -- I try to do every page.

7    I don't think there's anything else that I can add to

8    any of that.  Is there anything that we missed?

9         **INMATE CHAVEZ:**  I mean outside of participating

10   with fellow inmates in programs such as being a part of

11   the football team and so forth and so on, no.  But I

12   got a certificate here from one of the football

13   championships.

14        **DEPUTY COMMISSIONER HARMON:**  Okay.  Flag

15   football in '04.

16        **INMATE CHAVEZ:**  Yes, Sir.

17        **DEPUTY COMMISSIONER HARMON:**  Okay.

18        **INMATE CHAVEZ:**  I participate in all, too, like

19   active sports as best as possible.

20        **DEPUTY COMMISSIONER HARMON:**  That's good.

21        **INMATE CHAVEZ:**  I think important to be able to

22   get along with all races and all people regardless of

23   where we're at.

24        **DEPUTY COMMISSIONER HARMON:**  Okay.  How about

25   anything else?  Anything else we missed?

26        **INMATE CHAVEZ:**  Well, the things that I'm

27   currently working on right now, I don't have

1   certificates on them right now, but I'm working on

2   getting my forklift license, which I was waiting for

3   the final test.  But because of weather, we never got

4   around to it.

5       **DEPUTY COMMISSIONER HARMON:**  That's usually just

6   a three-day program, isn't it?  You should get over

7   that pretty quick.

8       **INMATE CHAVEZ:**  Well, the way they're doing it

9   over there, they have so many people on the list that

10  we did the written and then we had to wait like five

11  months before we could do the walking -- walking test

12  in which you're graded on the driving test.

13      **DEPUTY COMMISSIONER HARMON:**  Okay.  Unless I --

14  Unless we've missed something else, I think we've got

15  it all.  I've gone through every page of this.  We're

16  going to go on to your doctor's reports.  Now before we

17  do, I want to ask you a couple of very important

18  questions.  If you remember, I'm doing post-conviction

19  factors; the things that occurred since you came to

20  prison to where we are today.  So the question that I'm

21  going to ask you first of all is do you believe that

22  you still pose a risk to the safety to the people

23  outside of the prison walls today?

24      **INMATE CHAVEZ:**  No, I don't.

25      **DEPUTY COMMISSIONER HARMON:**  What do you believe

26  makes you a different man today than the man that came

27  into prison for the life crime?

28

1        **INMATE CHAVEZ:**  Well, what makes me very

2    different is that I had a reality check.  I had reality

3    check from the reckless drunk that I was into a person

4    that has been sober for the last 14 and a half years,

5    and have been actually awoken from the dead sleep of

6    being an alcoholic and a drunk.  I spent all my time

7    drunk and never really realizing what was going on

8    around me.  Just living life as it came.  Over the last

9    few years, I've educated myself.  I've learned a lot.

10    I've grown out of the immature ignorance that I had in

11    my life.  And I've overcome many a difficulties that

12    have come my way.

13        **DEPUTY COMMISSIONER HARMON:**  Okay.  Let's look

14    at your psychiatric reports now.  What I generally do

15    is take parts of your two most recent reports, so

16    listen carefully and you'll be given an opportunity to

17    add to that, okay.  But your first report here and the

18    most current will be a report by Dr. Macomber,

19    M-A-C-O-M-B-E-R, a Psychologist, from March the 6th.

20    And in that report going to the area of clinical

21    assessment, he says in part under current mental status

22    and treatment needs and he's speaking to you, he says:

23            "Mr. Chavez related during the interview

24            in an open, (inaudible), talkative, and

25            cooperative manner.  He was alert and well

26            oriented.  His thinking was rational,

27            logical, and coherent.  Affect was

1              appropriate.  His judgment was intact.

2              His self-awareness and insight were good.

3              In the past, he has had a substance abuse

4              problem in the community.  He readily

5              confesses that he used to be an alcoholic.

6              The commitment offense was related to his

7              extremely intoxicated condition.  He

8              stated that he used to drink to the point

9              of blacking out.  He also had a history of

10             addiction to cocaine for about one year

11             prior to his incarceration.  Due to the

12             fact that he has remained clean and sober

13             for 14 years, this is certainly no longer

14             a current diagnostic problem.  Due to the

15             fact that he has remained

16             disciplinary-free for 14 years, he cannot

17             be considered to have Antisocial

18             Personality Disorder at this time."

19  Under current diagnostic impressions, under Axis I:  No

20  Mental Disorder.  Axis II:  No Personality Disorder.

21  And Axis V:  A current GAF of 90.  In the area of the

22  review of the life crime, the doctor wrote in part:

23             "Mr. Chavez openly accepted total

24             responsibility for his commitment offense.

25             He can remember some aspects of the

26             commitment offense.  He was heavily

27             intoxicated on alcohol at the time and he

30

1          blacked out after the victim began

2          slapping him in the face.  The argument

3          was over the fact that the victim wanted

4          him to leave his common-law wife at the

5          time and go live with her.  When he told

6          her that he did not intend to do this, she

7          began slapping him.  She tried to choke

8          him and he in turn choked her.  He has no

9          memory of the offense after that.  He

10         later realized that he had killed the

11         victim, who was in the car with him.  He

12         removed her body from the car and then he

13         tried to leave the area but he was

14         apprehended.  He was very sorry for what

15         he did.  He stated that the memory of this

16         assault on the female victim is something

17         that he has to live with on a daily basis.

18         He knows that this has a very strong

19         negative impact on her family and he feels

20         badly about that.  His feelings of remorse

21         appear to be sincere and genuine.

22         Mr. Chavez's history of (inaudible) was

23         due to his intoxication and poor judgment

24         at the time of his life.  There's no

25         evidence to support the conclusion that he

26         has any kind of Psychosexual Disorder or

27         problems in his life."

1   Under assessment of dangerousness:

2           "In considering the potential for

3           dangerousness and behavior in the

4           institution, this man has grown, matured

5           (inaudible) over his years in custody.  He

6           has good judgment and self-control at this

7           point in his life.  As a result, the

8           potential for violent behavior in

9           comparison to other inmates is below

10          average.  In considering potential for

11          dangerous behavior in the community, he

12          does pose any more risk than the average

13          citizen in the community.  At the time of

14          commitment offense, present alcohol use

15          was a significant risk factor.  However,

16          due to the fact, as noted above, this is

17          no longer a significant risk factor in his

18          life."

19  Under clinical observations, comments, and

20  recommendations in part:

21          "There are no mental and emotional

22          problems in this case that would interfere

23          with parole planning.  The prognosis for

24          successful adjustment in the community in

25          this case is excellent."

26  And this is from Dr. Macomber.  The prior report from

27  Jeff Howlin (phonetic) was from February '02.  And

32

1    taking part of that report, the doctor starts out with

2    your history that you and the Commissioner have covered

3    pretty well there.  Going to the area of clinical

4    assessment under current mental status and treatment

5    needs, the doctor wrote in part speaking of you:

6            "He was coherent, cooperative, calm, and

7            alert throughout the interview.  There was

8            no evidence of mood or a thought disorder.

9            His judgment appeared to by sound.  He

10           demonstrated what seems to be based on

11           past reports improved insight into his

12           commitment offense."

13   Under current diagnostic impressions:

14           "Under Axis I:  Polysubstance Dependence

15           in Institutional Remission.  Axis II:

16           Antisocial Personality Disorder Improving.

17           Axis V:  A current GAF of 80.  His

18           prognosis is positive in being able to

19           maintain his current mental status and

20           upon parole."

21   Under the heading of the review of the life crime in

22   part:

23           "He admits to being heavily intoxicated at

24           the time of the crime.  He had consumed

25           both alcohol and cocaine prior to the

26           event.  He accepts (inaudible)

27           responsibility and says, quote, 'It was a

1        tragic accident.  I take full

2        responsibility.'  End of quote.  He

3        admitted to not remember much of the even

4        and being quite intoxicated.  He appeared

5        to be remorseful when discussing the death

6        of the victim."

7   Under assessment of dangerousness in part:

8        "It would appear that he has made some

9        gains psychologically as compared to some

10       of his behavior prior to his

11       incarceration.  Violence potential within

12       a controlled setting is estimated to be

13       average relative to the level-two inmate

14       population.  And if released to the

15       community, his violence potential is

16       estimated to be slightly higher than the

17       average citizen in the community.

18       Clearly, the most significant risk factor,

19       which could be a precursor to violence for

20       Inmate Chavez, would be continued abuse of

21       alcohol and/or drugs.  He minimizes

22       somewhat his substance abuse issues;

23       therefore, should this man use substances

24       again, his violence potential would be

25       considered much higher than the average

26       citizen in the community."

27   Under clinical observations, comments, and

34

1    recommendations in part:

2            "This inmate is competent and responsible

3            for his behavior.  This inmate does not

4            have a mental health disorder, which would

5            necessitate treatment either during his

6            incarceration period or following on

7            parole.  Continue efforts to seek

8            self-knowledge and greater understanding

9            of behavior patterns through self-help

10           groups offered and as available within

11           CDC."

12   And that's part of Dr. Howlin's report.  So,

13   Mr. Chavez, what I've done, like I've told you, I've

14   taken parts of the two most recent doctor's reports,

15   parts of your counselor's reports, and parts of your

16   entire institutional adjustment.  I may have

17   inadvertently left out areas important to you and your

18   attorney.  I'm going to return to the Chair here,

19   because we're going to go into your parole plans and

20   any other questions that we want to ask you.  Before we

21   do, is there anything you'd like to add to the areas

22   that I've covered?

23           **INMATE CHAVEZ:**  No, Sir.

24           **DEPUTY COMMISSIONER HARMON:**  Did we cover things

25   okay?

26           **INMATE CHAVEZ:**  Yes, Sir.

27           **DEPUTY COMMISSIONER HARMON:**  Counselor?

35

1       **ATTORNEY RUTLEDGE:** Yeah.

2       **DEPUTY COMMISSIONER HARMON:** Okay, thank you.

3 I'll return to the Chair.

4       **PRESIDING COMMISSIONER KUBOCHI:** Thank you. In

5 regard to your response to Commissioner Harmon that you

6 feel you are not a danger and your willingness to talk

7 about the life crime itself, in looking at the

8 probation report and statement, it's a quote regarding

9 your version of facts, quote:

10       "It was a Mother F-ing accident. I fled

11       so my witnesses would not get hurt coming

12       to court. A family member of other gangs

13       was involved. I want to go to a prison

14       facility in Southern California."

15 Unquote. That doesn't sound like a person who admitted

16 guilt back in 1993.

17       **INMATE CHAVEZ:** I admitted and accepted full

18 responsibility from the beginning when I was in the

19 police station. When I started going to court, and my

20 family tried coming to court, it would (inaudible) and

21 that's when I made that comment to the probation

22 officer's report. That was after I took off. The

23 people are in -- it was before. But if you read the

24 police report from the beginning, I was (inaudible)

25 from the very beginning I accepted responsibility from

26 the very beginning. I never tried denying, or hiding,

27 or ducking from and of it.

36

1          **PRESIDING COMMISSIONER KUBOCHI:**  When you were

2    detained by the police, you were in a 1973 Chevrolet

3    vehicle.  Is that correct?

4          **INMATE CHAVEZ:**  Yes, Sir.

5          **PRESIDING COMMISSIONER KUBOCHI:**  That was the

6    victim's, Sonia Sanchez's, vehicle, right?

7          **INMATE CHAVEZ:**  Yes, Sir.

8          **PRESIDING COMMISSIONER KUBOCHI:**  Why did you

9    take her vehicle after she was dead?

10          **INMATE CHAVEZ:**  I just really didn't remember

11    too much.  I panicked.  I was afraid.  And when I

12    panicked, I tried to leave.

13          **PRESIDING COMMISSIONER KUBOCHI:**  When you were

14    booked, there was an inventory search and they found

15    two women's gold bracelets, one with the name Sonia on

16    a nameplate and two gold rings.  One of the -- They

17    appeared to be female.  Detective Dougherty, in

18    participating with the review of the victim's body,

19    indicated that to him in the presence of the coroner it

20    looked like the victim had a ring on her left finger

21    recently taken off because there was an impression on

22    that ring finger.  And you had two women's gold rings

23    on your person at the time of inventory.  How did

24    these -- How did you come into possession of Sonia's

25    jewelry if this was just something that happened as a

26    result of her getting made at you?

27          **INMATE CHAVEZ:**  When they pulled me out of the

37

1    car, the stuff that was sitting on the seat, they put

2    on me when they stood me outside of the car.  And they

3    were on me when they pulled me into the police station.

4    Those items were all in the car when she had removed

5    her jewelry from her hands and neck.

6            PRESIDING COMMISSIONER KUBOCHI:  And Officer

7    Davis, that's 3686, indicated during the booking he

8    noticed bloodstains on the front of your boxer shorts.

9    Did he see blood on the front of your boxer shorts?

10           INMATE CHAVEZ:  I actually don't remember.  They

11   said that there was.  And they said there was some

12   blood on my hands.  But I don't remember any blood.

13           PRESIDING COMMISSIONER KUBOCHI:  And the coroner

14   in listing his cause of death indicated strangulation,

15   but he also he found indications of sodomy.  And you

16   understand what sodomy is, don't you?

17           INMATE CHAVEZ:  Yes, I do.

18           PRESIDING COMMISSIONER KUBOCHI:  He noticed a

19   dilation of the anal ring.  There was some hemorrhaging

20   around -- and I'm going to spell it, A-N-O-R-E-C-T-A-L

21   M-U-C-O-S-A-L hemorrhaging, anal laceration.

22           DEPUTY COMMISSIONER HARMON:  Excuse me.

23                       [Off the record.]

24           DEPUTY COMMISSIONER HARMON:  And go ahead.

25           PRESIDING COMMISSIONER KUBOCHI:  Also vaginal

26   laceration.  And it's your contention there was no sex?

27           INMATE CHAVEZ:  There was no sex.  There was

38

1  foreplay when we were messing around in the car before
2  the argument.  And like I explained before in the past
3  in past Boards, the only information I have for that is
4  while we were sitting around there and messing around
5  playing with each other, that's the only result it
6  could have been from that.  But we never had no kind of
7  sexual intercourse, but we were messing around,
8  kissing, excuse my language, ass grabbing, and whatnot.
9       PRESIDING COMMISSIONER KUBOCHI:  Well, you
10 remember that but you don't remember killer her.
11      INMATE CHAVEZ:  Like I said, when we started
12 arguing and fighting, I was still drinking.  And I
13 remember bits and pieces of it and I put a lot of it
14 together from the police report and the court reports
15 that I received over the year that I asked for.  But
16 for most of it, I don't.
17      PRESIDING COMMISSIONER KUBOCHI:  In looking at
18 the officer's report who stopped you, I don't notice
19 any empty containers of alcohol in your car by his
20 observations.
21      INMATE CHAVEZ:  I couldn't explain that at all.
22      PRESIDING COMMISSIONER KUBOCHI:  And once again,
23 what is it that caused you to kill this woman?
24      INMATE CHAVEZ:  Because when we were drunk and
25 started arguing and fighting.  Once she hit me, I
26 assume that I got real angry and that's when I blacked
27 out.  When I came to, she was lying right there next to

39

1  me dead.

2      **PRESIDING COMMISSIONER KUBOCHI:**  Why did you

3  drag her out and leave her on the beach?

4      **INMATE CHAVEZ:**  That's when I panicked.  I

5  pulled her out of the car and I started to leave.

6      **PRESIDING COMMISSIONER KUBOCHI:**  And you didn't

7  call 911 for medical aid, right?

8      **INMATE CHAVEZ:**  No, Sir.

9      **PRESIDING COMMISSIONER KUBOCHI:**  And you didn't

10  know at the time she dead when you pulled her out of

11  the car, did you?

12      **INMATE CHAVEZ:**  No, Sir.

13      **PRESIDING COMMISSIONER KUBOCHI:**  Then why did

14  you leave her there?

15      **INMATE CHAVEZ:**  Because I panicked.  I was

16  afraid.

17      **PRESIDING COMMISSIONER KUBOCHI:**  I have no

18  further questions.  Commissioner Harmon?

19      **DEPUTY COMMISSIONER HARMON:**  No, Commissioner.

20  You covered a lot of areas that I was going to cover.

21  I've just a little more.  You said that you were both

22  intoxicated.  I'm reading the coroner's report here and

23  the only thing in her system and I'm referring to the

24  results.  Her blood alcohol was .09 meaning that it

25  would have been illegal to drive but she sure wouldn't

26  be blindly drunk with that kind of a BA.  I don't --

27  Why do you say she was intoxicated?  What are you

1  basing that on?

2      **INMATE CHAVEZ:**  I was talking about myself being

3  intoxicated.  I mean I know that she had been drinking

4  while we were at the party.  When she picked me up, we

5  were drinking.  But I started drinking early that

6  morning.  I really don't know how much she had to

7  drink.

8      **DEPUTY COMMISSIONER HARMON:**  I thought you said

9  we were intoxicated.

10      **INMATE CHAVEZ:**  Well, we both had been drinking.

11  I mean I couldn't tell you exactly how much she had to

12  drink.  I just know how much I had to drink.

13      **DEPUTY COMMISSIONER HARMON:**  There were

14  footmarks on the back of her clothes.  Do you remember

15  kicking her?

16      **INMATE CHAVEZ:**  No, Sir.

17      **DEPUTY COMMISSIONER HARMON:**  Did you cut her

18  with any type of instrument?

19      **INMATE CHAVEZ:**  No, Sir.

20      **DEPUTY COMMISSIONER HARMON:**  One of my big

21  concerns is that for some reason you don't have any

22  memory of some pretty significant parts of this

23  particular crime.  And with no understanding of what it

24  is that happened, how can I be assured that you

25  wouldn't do the same thing again if you were released

26  into the community?

27      **INMATE CHAVEZ:**  I understood what happened and

1    it took me years of talking, studying books, reading my

2    transcripts from court, the police report, the

3    coroner's report, talking to friends that were around,

4    and I understood and I've accepted what happened.  And

5    like I said, the main issue of it was me and my

6    drinking.  And that's one of the things that I know for

7    a fact that I would never ever do again.  I will never

8    touch it or get near it again at all.

9        **DEPUTY COMMISSIONER HARMON:**  Well, even

10    yourself, I mean, you're male.

11        **INMATE CHAVEZ:**  Yes, Sir.

12        **DEPUTY COMMISSIONER HARMON:**  And being extremely

13    intoxicated and trying to make love to the lady,

14    there's a lot that goes into that kind of relationship

15    at that particular time, and yet your memory has for

16    some reason gone blank.  I still don't understand why.

17    I honestly don't understand why you don't remember if

18    you were involved in that kind of activity with her

19    just prior to murdering her.

20        **INMATE CHAVEZ:**  When we -- Like I explained

21    before when we were sitting there talking, it wasn't

22    something that we had -- were continuing.  It was

23    something that I was trying to mend.  And I don't know

24    if I could explain it as anger at being drunk or just

25    ignorant.  But I've done my best to remember as much of

26    it as I can.  I've spoken openly about it, and I've

27    done my best to accept everything that I was told that

42

1   happened and what I had done to the fullest.  You know

2   I never sat here and tried to deny or lie doing things.

3         **DEPUTY COMMISSIONER HARMON:**  No, that's not what

4   I'm implying.  That's not what I'm implying, not at

5   all.  I guess what I'm trying to get across is just

6   about everybody walks in here and says I have great

7   remorse, I'm really sorry for what happened, I take

8   full responsibility is probably what we hear probably

9   four out of five times a day, three out of four.  But

10  what makes you different is that when I was listening

11  to you talk to the Commissioner, you have for some

12  reason blanked out your memory of what occurred during

13  this incident other than what you've read and what

14  you've heard and I don't understand why.  I don't have

15  any reason to believe that you were suffering from any

16  type of serious mental problem at the time whether it

17  was alcohol induced or whether it was psychiatric or

18  whatever.  So I'm trying to get a better understanding

19  of what was going on in your mind then and now because

20  I don't want you going out and doing it again.  You've

21  got me worried.

22        **INMATE CHAVEZ:**  I mean I couldn't explain it.  I

23  wish I could say don't worry, it isn't going to happen,

24  and it's over with, but I understand -- I understand

25  your concerns.  I really do.

26        **DEPUTY COMMISSIONER HARMON:**  Okay.

27        **INMATE CHAVEZ:**  And I really wish that there was

43

1   a right answer.

2       **DEPUTY COMMISSIONER HARMON:**   You cut your own

3   wrists in about '95, didn't you?

4       **INMATE CHAVEZ:**   Yes, Sir.

5       **DEPUTY COMMISSIONER HARMON:**   Why did you do

6   that?

7       **INMATE CHAVEZ:**   It was for self-protection.   I

8   had -- The victim's family was trying to get to me on

9   the yard.   When I went to the CO's, they just laughed

10  it off, and pushed me aside, and told me to just go in

11  the building.   So I cut myself so they could get me off

12  the yard.

13      **DEPUTY COMMISSIONER HARMON:**   But you threatened

14  to hurt yourself again, didn't you?

15      **INMATE CHAVEZ:**   No, Sir.

16      **DEPUTY COMMISSIONER HARMON:**   You didn't?   You

17  didn't remember telling that to the officers?

18      **INMATE CHAVEZ:**   No, Sir.

19      **DEPUTY COMMISSIONER HARMON:**   Okay.   I'll bring

20  it back up again.   I'll have to look it up again, but

21  it was something that I had read earlier.   That was the

22  only time you had cut your wrists?

23      **INMATE CHAVEZ:**   Yes, Sir.

24      **DEPUTY COMMISSIONER HARMON:**   Okay.   The only

25  other thing just for clarification, you said to the

26  Commissioner here earlier and I got them as an exact

27  quote.   I tried to write it down this thing about it

44

1   being a tragic accident.  Do you believe that it's an

2   accident today?

3        **INMATE CHAVEZ:**  No, Sir.

4        **DEPUTY COMMISSIONER HARMON:**  What do you believe

5   it is?

6        **INMATE CHAVEZ:**  I believe that it was ignorance

7   completely from being stupid and drunk.  It's not an

8   accident at all.  There were circumstances from my own

9   actions.

10       **DEPUTY COMMISSIONER HARMON:**  So when did it go

11  from an accident to where it is today?  Because looking

12  in the doctor's reports, you know it wasn't that long

13  ago that you said it was a tragic accident.

14       **INMATE CHAVEZ:**  I always believe that anything

15  that happens, whether it's someone or hurts people

16  (inaudible) do something and even if it is an accident,

17  but accepting the responsibility of it I see it in two

18  different ways.  One, that it was my stupid actions and

19  my stupidity and the other one that it was sad

20  accident.  It wasn't purposely or intentionally what I

21  went out to do.

22       **DEPUTY COMMISSIONER HARMON:**  Okay.  I'm still

23  caught up where the Commissioner is.  You don't

24  remember your hands around her throat?

25       **INMATE CHAVEZ:**  No, Sir.

26       **DEPUTY COMMISSIONER HARMON:**  You know it's very

27  difficult to kill a human being, to strangle them.  You

45

1 know it's very difficult.  It doesn't just happen

2 instantly.

3         **INMATE CHAVEZ:**  I've been told so.

4         **DEPUTY COMMISSIONER HARMON:**  And you don't

5 remember the length of time that it took to strangle

6 this woman?

7         **INMATE CHAVEZ:**  No, Sir.

8         **DEPUTY COMMISSIONER HARMON:**  Thank you,

9 Commissioner.  I'll return to the Chair.

10        **PRESIDING COMMISSIONER KUBOCHI:**  Sir, pursuant

11 to the Penal Code Section 3042, notices have gone out

12 to law enforcement agencies and next of kin in regard

13 to their legal right to make a statement in regard to

14 your suitability and also in regard to any letters of

15 support for your suitability.  The District Attorney's

16 representative, Mr. Eastman, is here as a result of

17 that notice.  At this point in time, he is allowed to

18 ask questions of the Panel, which in turn your

19 responses will be to the Panel.  Mr. Eastman?

20        **ATTORNEY RUTLEDGE:**  Commissioner, could I

21 interject just -- My client did want to object to The

22 People being here, asking questions, and giving their

23 opinion.  He feels that he made an agreement with them

24 in his plea bargain and that by them being here today

25 that it's a violation of the agreement that he made

26 with them.

27        **PRESIDING COMMISSIONER KUBOCHI:**  Except the DA

46

1    has a right to be here under 3042.

2         **ATTORNEY RUTLEDGE:**  Well, it actually says that

3    they may be here.  It doesn't say they shall be here or

4    they have to be here.  It says they may.  It's up to

5    the Panel as to whether or not they're going to allow

6    them to be here.

7         **PRESIDING COMMISSIONER KUBOCHI:**  We're allowing

8    him to be here.

9         **ATTORNEY RUTLEDGE:**  Thank you.

10        **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Eastman?

11        **DEPUTY DISTRICT ATTORNEY EASTMAN:**  He was a

12   member of the Florence Gang or a gang with a name of

13   Florence.  Would you ask him is he was a member of a

14   Florence 13 Gang?

15        **PRESIDING COMMISSIONER KUBOCHI:**  Were you a

16   member of the Florence 13 Gang?

17        **INMATE CHAVEZ:**  No, Sir.  I was associated

18   because of my family.  Them being from that

19   neighborhood that I was associated when I was

20   incarcerated.

21        **PRESIDING COMMISSIONER KUBOCHI:**  Thank you for

22   your answer.

23        **DEPUTY DISTRICT ATTORNEY EASTMAN:**  What

24   neighborhood was that?

25        **PRESIDING COMMISSIONER KUBOCHI:**  Sir, what

26   neighborhood?

27        **INMATE CHAVEZ:**  The neighborhood that he

1    mentioned, the Florence Gang.

2            **PRESIDING COMMISSIONER KUBOCHI:**  Florence.

3            **DEPUTY DISTRICT ATTORNEY EASTMAN:**  But what part

4    of Los Angeles area was that area?

5            **INMATE CHAVEZ:**  That's off of Compton and

6    Florence in the South Central Los Angeles area.

7            **PRESIDING COMMISSIONER KUBOCHI:**  Thank you, sir.

8            **DEPUTY DISTRICT ATTORNEY EASTMAN:**  Does he have

9    a tattoo on his left hand?

10           **PRESIDING COMMISSIONER KUBOCHI:**  He has a tattoo

11   on his left hand.

12           **DEPUTY DISTRICT ATTORNEY EASTMAN:**  That's all

13   the questions I have.

14           **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

15   Mr. Rutledge, it is your opportunity to ask any

16   questions of your client, as you deem necessary.

17           **ATTORNEY RUTLEDGE:**  No questions.

18           **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.  At

19   this time, Mr. Chavez, the District Attorney, your

20   attorney, and you will be permitted to make a final

21   statement.  And I will now ask the District Attorney

22   for his closing statement.

23           **DEPUTY DISTRICT ATTORNEY EASTMAN:**  I want to

24   start my remarks by saying that I don't want to give up

25   on this prior rape arrest.  I understand that a Board

26   investigator, which all of this is in the file,

27   inquired and learned that that rape arrest was rejected

48

1   because they thought they had the wrong victim.

2        **PRESIDING COMMISSIONER KUBOCHI:**  Well, I'm not

3   going to allow any statement about a case with no

4   conviction, sir.

5        **DEPUTY DISTRICT ATTORNEY EASTMAN:**  Okay.  Okay.

6        **PRESIDING COMMISSIONER KUBOCHI:**  We are not here

7   to relitigate guilt or innocence (inaudible) underlying

8   crime, but even more so on the cases that did not

9   result in a conviction.  You had the chance back in

10  1992 to do that.

11       **DEPUTY DISTRICT ATTORNEY EASTMAN:**  Well, we have

12  the report in the file, with all due respect.  The

13  report has been in the file from the beginning.

14       **PRESIDING COMMISSIONER KUBOCHI:**  I'm not

15  allowing any comment on that.

16       **DEPUTY DISTRICT ATTORNEY EASTMAN:**  Commissioner,

17  I'm a little bit surprised because in all of the other

18  hearings that I've attended for many, many years going

19  back as probably as long as 25 years, when we have a

20  fact scenario that's been part of the record from the

21  beginning --

22       **PRESIDING COMMISSIONER KUBOCHI:**  I have made my

23  ruling (inaudible).

24       **DEPUTY DISTRICT ATTORNEY EASTMAN:**  Okay.  Moving

25  on, the only information we have that the inmate

26  blacked out is from what he has told -- told

27  consistently from the beginning.  As has been discussed

49

1    here today, it really doesn't hold together.  The

2    sexual aspects, if you're that drunk, you cannot as a

3    male perform sexually.  Right there I think is a point

4    upon which that story can be challenged.  This to me

5    reading this report, this inmate had and probably still

6    has a very tough time getting along with women.  I just

7    want to reiterate to belabor the obvious that this is

8    very horrible crime.  In reading the comments of

9    Commissioner Fisher at the last hearing, she went on

10   about how horrible this crime was.  And I don't see

11   that this inmate from the beginning has come to grips

12   with this offense.  I think he lacks insight.  He lacks

13   remorse.  I think he is mouthing the words of remorse.

14   And as such, there is a serious question of how much he

15   can be relied on and how much of a danger he is.  He is

16   to be complimented for his conduct in the institution.

17   I think the parole plans are a bit on the weak side,

18   but other than that, the things he has done are worthy

19   of compliment.  But going back to the facts of the life

20   crime and to his -- the way he has reacted to the life

21   crime over all of these years, I just -- I think he

22   needs more time.  I think he needs to be more candid

23   about what happened.  I think he needs to not only

24   mouth the fact that he has remorse but -- but I think

25   he needs to demonstrate to Panels that he really

26   understands what happened.  And it was horrible and

27   that he cannot be allowed back on the streets until he

1   really understands what he did in this case and perhaps

2   in others.  I do notice in the conversation and that's

3   why -- one of the reasons I asked about the gang.  He

4   hung with a gang in South Central Los Angeles in the

5   Newton Division quite a ways away from Long Beach.

6   He's talking about this particular victim and this

7   particular offense happened in Long Beach, which is

8   quite a ways away from Florence Avenue, and he's

9   talking about the victim's family in this case having

10  gang affiliations and threatening him and causing him

11  to slash his wrists.  I think there are severe problems

12  with that part of the story.  I think he still has some

13  sort of gang affiliation or gang thoughts on the

14  street, and I think that further complicates his

15  applications to be let out.  Thank you very much.

16      **PRESIDING COMMISSIONER KUBOCHI:**  Thank you,

17  Counsel.  Mr. Rutledge, it's your opportunity to

18  address the Panel.

19      **ATTORNEY RUTLEDGE:**  Thank you, Commissioner.

20  There's no doubt and my client is very aware that these

21  are one of those cases where it -- it's bad facts.

22  It's just -- It is an ugly life crime as far as what

23  happened.  And my client is remorseful as to what

24  happened.  But we will say, okay, because there's bad

25  facts and it's a bad life crime as far as what

26  happened.  Does that mean that he stays locked up

27  forever?  No.  The legislature in their wisdom has

51

1    determined that if he does what he is supposed to be

2    doing, he programs, he shows that he is remorseful and

3    has been doing the self-help, and all the things that

4    he's supposed to be doing, then he gets a chance to

5    parole regardless of the fact that the life crime is a

6    bad life crime, which is what we have in this case.

7    And I understand the Commissioners' concerns saying

8    that, well, you know, you're saying you blacked out but

9    it's hard to understand that.  And what evidence do we

10   have that shows that he actually did black out?  Well,

11   I think what he's been telling the Panel is in fact

12   where we have the evidence.  And the evidence is in

13   fact saying that and you can look at the documentation

14   that's been provided by The People in the past in

15   saying that they were partially undressed, but they

16   never did complete the sex act.  Now it's been

17   mentioned that in fact when you get heavily -- when a

18   male gets heavily intoxicated, it's very difficult to

19   perform.  And in fact when we look at the autopsy,

20   there isn't any showing that there's any sperm or

21   anything along those lines that would indicate that the

22   act actually was performed.  There is indication

23   showing that there was heavy petting and there was some

24   penetration based on that.  That's consistent with what

25   my client is saying, so he's saying that he was drunk

26   and that he blacked out.  The fact that they didn't

27   perform the act is consistent with what my client is

52

1  saying.  When we look at the psychiatric reports, we

2  see what we would want to see.  We see that there was

3  progression of getting better and that's exactly what

4  we have.  We have the most recent report saying that

5  he's no more danger to society than the average

6  citizen.  He grew up in a fairly stable social history.

7  We've got his mom and step dad there.  His step dad was

8  a welder.  His mom was selling Avon and that's about as

9  American as you can get, his mom out there selling

10 Avon.  He doesn't have any 115s.  That's really unusual

11 to see.  And again, he should be commended for that.

12 The four 128s are pretty minor and the most recent one

13 was back in 2000.  He has been doing self-help.  He's

14 been doing AA/NA, his Anger Management, working in the

15 PIA.  And I think he's got great parole plans.  He's

16 got a couple of residential options.  He's got several

17 options as far as work goes.  He's got the roofing

18 company offer.  He's got the bakery offer.  And

19 something that hasn't really been mentioned, he's got

20 vocational skills both in Wood Products and Welding

21 that will allow him to be able to get job as well.  So

22 based on all the hard work that he's done while he's

23 been in, I would ask that he be given a date.  Thank

24 you.

25 **PRESIDING COMMISSIONER KUBOCHI:**  Thank you for

26 your comments.  Mr. Chavez, this is your opportunity to

27 speak with the Panel.

53

1      **INMATE CHAVEZ:**  First and foremost, I've got to

2   mention that whether I'm released or not, I truly am

3   sorry for actions and what I've done.  Over the years,

4   I struggled with it.  And I've studied, and I've

5   learned and I grew within myself.  And even with all

6   that I still suffer with it.  It still pains me when I

7   think about it.  But I've accepted it and I've done my

8   best to move forward and to rehabilitate the best that

9   I can.  I do all my self-help programs.  And with no

10  disrespect to the Board or anybody, but I don't do them

11  for anyone else but for myself to improve myself and to

12  help myself to better myself.  And I've done everything

13  that I've been told year after year after year.  I've

14  done everything I've ever been told to do.  Every time

15  they told me to this, do that, I always do it.  I don't

16  want to disrespect people.  I don't get into fights.  I

17  don't argue.  I just do what I'm told.  And it was an

18  ugly crime and I am sorry.  I wish I could say if I

19  could change this, I could change that, but I can't,

20  you know.  What's done is done.  And I wish there was a

21  magic wand, and go back and change it, but I can't.

22  And I wanted to read a comment from my last Board

23  hearing that Commissioner Fisher made.  And it's on

24  page 65 of my transcripts where Commissioner Fisher

25  stated:

26          "I want to tell you that this is a

27          one-year denial.  And I don't give

54

1        one-year denials unless I think someone is

2        really close to being suitable for parole

3        and we're real close."

4   Commissioner Fisher will be one of the most hardest

5   Commissioner that I've ever heard of.  When I held

6   this hearing, we communicated clearly.  And she made

7   those comments to me, and at the end when I got my

8   denial, she also made the comment on hoping that I come

9   in here and (inaudible) found suitable this following

10  year if I took care of those issues that I need to take

11  care of.  And I've done everything that was asked of me

12  (inaudible) to this Panel.  So I ask this Panel to

13  please look deep into your hearts, and look at

14  everything before you, and please find me suitable.

15          **PRESIDING COMMISSIONER KUBOCHI:**  Thank you for

16  your comments.  It's 3:44.  We will be in recess for

17  deliberations.

18          **ATTORNEY RUTLEDGE:**  Thank you, Commissioners.

19                  **R E C E S S**

20                    --oOo--

21

22

23

24

25

26

27

55

1        **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                **D E C I S I O N**

3        **DEPUTY COMMISSIONER HARMON:**  And you're on

4  record.

5        **PRESIDING COMMISSIONER KUBOCHI:**  It's four p.m.

6  in the matter of Juan Chavez, H-74168.  Mr. Chavez, the

7  Panel has reviewed all information received from the

8  public and relied upon the following circumstances in

9  concluding that you are not suitable for parole and

10  would pose an unreasonable risk of danger to society or

11  a threat to public safety if released from prison.  In

12  review of the manner in which this crime was carried

13  out, we find it was an especially cruel and callous

14  manner in that this woman, who was a casual friend of

15  yours, was killed through strangulation.  As

16  Commissioner Harmon pointed out, strangling somebody by

17  hand is not an easy thing to do.  I note that in all of

18  the reports filed with this case that are part of the

19  Board report that there were very few injuries on your

20  person, which would indicate that this victim was

21  totally rendered defenseless and was strangled with

22  your hands with very little provocation or

23  justification for such a -- for such an act.  The

24  reasons you've given in the past were that you were --

25  she got upset because you wouldn't leave your

26  girlfriend, but it was a casual relationship at best by

27  **JUAN CHAVEZ      H-74168      DECISION PAGE 1      3/5/2007**

56

1   reading all the reports.  You had casual sex with her.

2   There's no justification to kill somebody with your

3   hands.  We're not talking about self-defense.  We're

4   not talking about any of that.  The victim -- The

5   victim's body pursuant to the autopsy report indicated

6   injuries to her anus and her vagina.  What was

7   particularly difficult for you explain was you had

8   taken her car.  You claim that you strangled her but

9   you blacked out when you did that.  You take her out of

10  a car.  You drag her onto a beach.  Her jewelry is

11  found in -- The reports say it was taken from your

12  pocket; two women's rings, one bracelet -- two

13  bracelets, one with Sonia written on it was taken from

14  your pocket, and yet you say that was all a result of

15  you panicking.  So rather than having insights from you

16  through introspection and thinking about the causes --

17  the underlying causes within you that would cause you

18  to strangle somebody, this Panel hears black out from

19  alcohol, and a distancing from -- an attempt to

20  distance yourself from moral responsibility by just

21  blaming alcohol.  And yet when it comes to

22  rehabilitation, you say well, I won't drink again.  And

23  we find that it's not convincing.  That in order for

24  you to be found a suitable candidate, that you're not

25  an unreasonable risk of danger to society, you're going

26  to have to explain all these factors as to why whatever

27  **JUAN CHAVEZ       H-74168     DECISION PAGE 2    3/5/2007**

57

1    happened in that car would justify you taking the life

2    of another with your own hands.  We find that you have

3    failed to develop insights into the life crime and the

4    underlying causes within you.  You were on probation at

5    the time of this offense.  You had just been convicted

6    of a misdemeanor burglary and had been placed on

7    probation.  You are -- You have done well with your AA,

8    but your problem with alcohol preceded your

9    relationship with this woman.  The difficulties with

10   alcohol abuse will last way longer than the time of the

11   life crime.  But alcohol wasn't the sole reason for you

12   to have committed this crime.  You committed the crime,

13   not alcohol.  There are many people who drink alcohol

14   that never commit any violence or harm somebody else.

15   We've heard from the opposition from the Los Angeles

16   County representative pursuant to Penal Code Section

17   3042.  And we make the following findings:  That you

18   need therapy in order to face, and discuss, and

19   understand, and cope with stress in a nondestructive

20   manner.  Until progress is made, you continue to be

21   unpredictable and a threat to others.  We also find

22   that your gains such as the Anger Management Classes,

23   and we are giving you credit for the AA, but the Anger

24   Management Classes are recent in nature and we find

25   that there has -- there's a need to demonstrate the

26   ability to maintain gains over an extended period of

27   **JUAN CHAVEZ      H-74168     DECISION PAGE 3    3/5/2007**

58

1    time.  In a separate decision, the Panel finds that is

2    not reasonable to expect that parole would be granted

3    at a hearing during the next two years.  This case was

4    a very dispassionate, callous act.  Your act of

5    dragging this woman onto a beach outside of the car and

6    it was her own car.  I also note in the reports that

7    when you were detained and questioned by the police

8    after you were removed from the police car and they

9    found a registration to that car inside the patrol car.

10   There would be no reason for somebody who had blacked

11   out and panicked to have all of these acts that would

12   definitely show some consciousness and awareness of

13   what was going on.  And that's why we find your

14   explanations not to be credible enough to find that you

15   are not a danger to society.  This matter -- The way

16   that this was carried out shows a callous disregard for

17   human suffering.  There's no worse way than to kill

18   somebody with your own hands.  And as I have indicated

19   before, you were on probation when this crime was

20   committed and that has to be taken into consideration

21   when there is a finding as to whether or not you are

22   suitable for release.  I am making a finding that for

23   your next Panel a psychologist examination would be

24   beneficial in regard to your propensity for violence in

25   a free society, the extent that alcohol and drugs

26   contributed to this crime, but also more importantly,

27   **JUAN CHAVEZ      H-74168     DECISION PAGE 4    3/5/2007**

59

1    your ability to refrain from alcohol and drug abuse in

2    the future in a free society.  We're also going to ask

3    for a psychosexual analysis in regard to whether or not

4    there are some deep-seated problems in regard to your

5    relationship with woman, as pointed out by the District

6    Attorney.  We're not saying you have them, but you're a

7    young man.  You have a whole life ahead of you

8    notwithstanding the life crime that put you currently

9    behind bars.  You're going to want companionship in the

10   future with a significant other.  And what I personally

11   recommend is that you start doing some self-study books

12   in that regard so that you can assure the Panel that

13   you won't have this anger problem with people -- with

14   women that you live with.  For whatever reason, and I

15   didn't play amateur psychologist, for whatever reason,

16   something triggered deep within you that caused you to

17   commit a murder.  And I think the more that you address

18   this with the Panel, you're going to provide greater

19   assurances that you're -- that one of two scenarios;

20   you're not a ticking time bomb in regard to anybody,

21   male or female, that gets you mad, but if you establish

22   a long-term relationship in a free society, that you

23   really can recognize stress factors and you've

24   developed coping mechanism so that you won't even get

25   into a heated argument, let alone a physical

26   altercation with a female.  I think it's very

27   **JUAN CHAVEZ      H-74168      DECISION PAGE 5      3/5/2007**

60

1   important.  You can disregard what I'm recommending,
2   but these are factors that pertain not only to this
3   life crime, but you can see the District Attorney's
4   Office has noted the same -- has noted the same
5   observation.  And we would like to have some assurances
6   as to whether or not the psychologist believes at your
7   next hearing of whether or not further therapy programs
8   could benefit you.  I have recognized how well you've
9   done.  You have an excellent work record.  You've gone
10  through AA.  But for somebody to commit murder, to me,
11  those are starting points for you to gain back the
12  credibility to really freely and openly discuss your
13  suitability for parole.  I'm not minimizing that.  I'm
14  giving you the credit for that.  But you have to be
15  able and willing to talk about the dynamics is the best
16  way I can -- the dynamics, the factors that would cause
17  you to get so angry with a woman that you would kill
18  her with your bare hands.  Commissioner?
19      **DEPUTY COMMISSIONER HARMON:**  About the only
20  thing I can add is, you know being in the Twelve Step
21  Program since '93, I would sure think that you would
22  know the Steps and be able to belabor to those Steps,
23  you know, if not for yourself, for the victim if you
24  really had sincere remorse.  That would be extremely
25  important.  But the Commissioner covered it very well.
26  Those are my concerns and it was very well expressed.
27  **JUAN CHAVEZ       H-74168     DECISION PAGE 6    3/5/2007**

61

1    And I will return to the Chair.  I wish you luck, sir.

2              **PRESIDING COMMISSIONER KUBOCHI:**  I have nothing

3    further to say.  It's 4:10.  And continue on with being

4    discipline-free.

5              **ATTORNEY RUTLEDGE:**  Thank you, Commissioners.

6                      **A D J O U R N M E N T**

7                           --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED TWO YEARS.**

24   **THIS DECISION WILL BE FINAL ON: July 3, 2007**

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **JUAN CHAVEZ      H-74168      DECISION PAGE 7      3/5/2007**

6 2

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, TAMYRA MORGAN, a duly designated transcriber,
NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare
and certify under penalty of perjury that I have
transcribed one audio recording which covers a total of
pages numbered 1 - 61, and which recording was duly
recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD,
CALIFORNIA, in the matter of the SUBSEQUENT PAROLE
CONSIDERATION HEARING of JUAN CHAVEZ, CDC No. H-74168,
on MARCH 5, 2007, and that the foregoing pages
constitute a true, complete, and accurate transcription
of the aforementioned audio recording to the best of my
ability.

I hereby certify that I am a disinterested party
in the above-captioned matter and have no interest in
the outcome of the hearing.

Dated APRIL 10, 2007 at Sacramento County,
California.


_____
Tamyra Morgan Transcriber
**Northern California Court Reporters**